(No. 56275.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. CHARLES W. RICHARDS, Appellee.

*Opinion filed January 24, 1983.*

Tyrone C. Fahner, Attorney General, of Springfield, and John A. Barra, State's Attorney, of Peoria (John X. Breslin, of the State's Attorneys Appellate Service Commission, of Ottawa, of counsel), for the People.

Daniel D. Yuhas, Deputy Defender, of the Office of the State Appellate Defender, of Springfield (Jeffrey D. Foust, Assistant Defender, and John M. Wray, law student, of counsel), for appellee.

JUSTICE MORAN delivered the opinion of the court:

The defendant, Charles W. Richards, was indicted for burglary and, before trial, moved to suppress certain evidence allegedly obtained in an illegal search. The circuit court of Peoria County granted defendant's motion. The appellate court affirmed (103 Ill. App. 3d 1120), and we allowed the State leave to appeal.

This appeal raises but one question. Does an arrestee retain a reasonable and justifiable expectation of privacy in his personal effects once the police have legitimately viewed, inventoried and placed them in a police inventory envelope?

The testimony at the suppression hearing revealed the following facts. On January 12, 1980, a Peoria County detective, Robert Lucas, investigated a burglary at the residence of George W. Mullen in Peoria Heights. Among the items reported stolen were several firearms, a television set, and various pieces of jewelry, including a unique necklace. The necklace had a pendant made out of a 1925 silver dollar. Part of the coin had been cut out so that only the head of the liberty figure and the year remained. The detective's investigation revealed that defendant had applied for employment at Mullen's gaso-

line service station; that Harold J. Ramsey had helped the Mullens move into their home; and that both defendant and Ramsey resided at the Peoria County Work Release center.

On January 16, 1980, Lucas contacted the center and learned that defendant and Ramsey were last seen leaving the center for work on the morning of the burglary. At that time, both were released for a weekend furlough. The director at the center told Lucas that since that time, defendant had violated the center's work-release rules and had been arrested. Lucas then discovered that defendant was being held at the Tazewell County jail because of an overflow of inmates at the Peoria County jail. The record does not reveal the date of this incarceration.

At the time of detention, pursuant to the standard lockup procedure, the Tazewell County jail officer searched and inventoried all of defendant's personal effects. The items were then placed in a manila envelope with defendant's name on it. A necklace was among the items inventoried.

In furtherance of the burglary investigation, Lucas telephoned the Tazewell County jail and inquired about the inventoried property of defendant. A jail officer described the necklace, which matched the description of the necklace taken in the burglary. On the next day, Lucas brought Mrs. Mullen to the jail to look at the necklace. Pursuant to his request, the desk sergeant retrieved Richards' property envelope, opened it and removed the contents. Mrs. Mullen identified the necklace as a piece of jewelry taken from her home.

Lucas then took defendant into a private room, gave him the *Miranda* warnings, displayed the necklace, and questioned him about the burglary. Initially, defendant denied involvement in any burglary. Lucas reminded him that the necklace was among his personal effects. After-

ward, defendant made various oral and written inculpatory statements concerning the January 12 burglary.

Defendant moved to suppress the necklace, contending it was obtained in an unlawful warrantless search, and to suppress the inculpatory statements as fruits of the invalid search.

The State argues that the defendant lacked a reasonable expectation of privacy in the necklace after it was legally viewed and inventoried by the police and remained in police custody. The defendant concedes the inventory temporarily reduced his privacy interest in the necklace, but maintains that when it was placed into the police inventory envelope for safekeeping, his expectation of privacy was renewed.

It is fundamental that, in order to invoke the fourth amendment protection, the defendant must demonstrate an unreasonable government intrusion into his legitimate expectations of privacy. (*Smith v. Maryland* (1979), 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577; *United States v. Chadwick* (1977), 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476.) A protectable expectation of privacy must be both reasonable and justifiable. *People v. Campbell* (1977), 67 Ill. 2d 308, 316, *cert. denied* (1978), 435 U.S. 942, 55 L. Ed. 2d 538, 98 S. Ct. 1521.

In *United States v. Edwards* (1974), 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234, the police arrested the defendant late at night and charged him with attempting to break into a post office. The defendant's personal effects, except his clothes, were inventoried and he was placed in a cell. The police investigation revealed that the attempted entry was made at a wooden window, and several paint chips were left scattered on the window sill. The next morning the police ordered the defendant to remove his clothing and examined it. They found paint chips identical to those discovered on the window sill. The defendant moved to suppress admission of this

evidence, claiming the police seized his clothes without a warrant. The district court denied his motion, but the court of appeals reversed, saying that the warrantless siezure after the inventory search had been completed was a violation of the defendant's fourth amendment rights. The Supreme Court reversed, finding that the fourth amendment did not apply in these circumstances. The majority reasoned that the legal arrest substantially diminished the accused's legitimate expectations of privacy in his person and clothing. These expectations were thus overridden by countervailing police interest in weapons, means of escape and evidence of crime. The majority cautioned, however, that merely because the warrant requirement was inapplicable in that case, the police were still subject to constitutional constraints. A second look "must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *United States v. Edwards* (1974), 415 U.S. 800, 808 n.9, 39 L. Ed. 2d 771, 778 n.9, 94 S. Ct. 1234, 1239 n.9.

After *Edwards,* cases addressing similar factual situations to the case at bar have reasoned that a second inspection of personal effects, when previously exposed to police view under unobjectionable circumstances, does not invade any substantial privacy interest. *United States v. Phillips* (8th Cir. 1979), 607 F.2d 808; *United States v. Oaxaca* (9th Cir. 1978), 569 F.2d 518, *cert. denied* (1978), 439 U.S. 926, 58 L. Ed. 2d 319, 99 S. Ct. 310; *United States v. Jenkins* (2d Cir. 1974), 496 F.2d 57, *cert. denied* (1975), 420 U.S. 925, 43 L. Ed. 2d 394, 95 S. Ct. 1119; *State v. Bryant* (La. 1975), 325 So. 2d 255; *People v. Perel* (1974), 34 N.Y.2d 462, 358 N.Y.S.2d 383; *State v. Nesmith* (1979), 40 N.C. App. 748, 253 S.E.2d 594; *People v. Rivard* (1975), 59 Mich. App. 530, 230 N.W.2d 6.

For example, in *United States v. Jenkins* (2d Cir. 1974), 496 F.2d 57, the accused's money was inventoried for safekeeping following an arrest for a traffic violation. Less

than one week later, a second inspection of the money by a Federal agent revealed that the serial numbers of those bills coincided with marked bills stolen in a recent robbery. The court rejected the defendant's argument that *Edwards* was inapplicable because the second look was for the purpose of obtaining evidence of a different crime than that for which the arrest was made. The court said that this second inspection was not an intrusion into an area that the defendant could reasonably expect would remain private. It concluded that no reasonable expectations of privacy were invaded and no search occurred when the police officers simply looked again at what they had already lawfully seen.

In fact, the *Edwards* holding has been interpreted to mean "that *at least* when (i) an object lawfully came into plain view at the time of a search upon the arrestee's arrival at the place of detention, (ii) later investigation establishes that this item is of evidentiary value, and (iii) the item remains in police custody as a part of the arrestee's inventoried property, then it is permissible for the police, without a warrant, to retrieve that object and thereafter deal with it as an item of evidence." (2 W. LaFave, Search and Seizure sec. 5.3(b), at 315 (1978).) Cases decided before *Edwards* have also followed this reasoning. *United States v. Grill* (5th Cir. 1973), 484 F.2d 990, *cert. denied* (1974), 416 U.S. 989, 40 L. Ed. 2d 767, 94 S. Ct. 2396; *Evalt v. United States* (9th Cir. 1967), 382 F.2d 424; *Baskerville v. United States* (10th Cir. 1955), 227 F.2d 454.

The appellate court refused to extend *Edwards* and its progeny to the case at bar, but instead relied upon the reasoning and rationale found in *People v. Lafayette* (1981), 99 Ill. App. 3d 830, *cert. granted* (1982), 459 U.S. 986, 74 L. Ed. 2d 381, 103 S. Ct. 339, and *Brett v. United States* (5th Cir. 1969), 412 F.2d 401, *cert. denied* (1969), 396 U.S. 921, 24 L. Ed. 2d 202, 90 S. Ct. 252. In *Lafayette,* the defendant was arrested for disturbing the peace. He was

ordered to empty his pockets, and his personal effects were inventoried. The police then searched the defendant's shoulder bag to inventory its contents and found amphetamines in the shoulder bag. The court affirmed suppression of the amphetamines, saying that the shoulder bag carried an expectation of privacy independent of the arrestee's body and clothing.

In *Brett,* the defendant was arrested for importing, transporting, and concealing heroin. At the jail, he was given prison garb and his personal effects and clothing were put in a bag in the prisoner's property room. Three days later a narcotics agent requested the jail guard to inspect the contents of the property bag. The guard searched the defendant's pants pockets and found cellophane papers, containing traces of heroin, in the watch pocket. The court found this search invalid, but distinguished its facts from situations like the case at bar, saying that the search in *Brett* "was not a later look at items which had remained in police custody after having been discovered in an earlier and valid search, as in *Baskerville v. United States,* 227 F.2d 454 (10th Cir. 1955)." *Brett v. United States* (5th Cir. 1969), 412 F.2d 401, 405.

Unlike *Lafayette* and *Brett,* the case at bar did not involve a search for items the defendant had concealed in a container, or a further inspection of defendant's personal effects to discover something not previously seen by the police. The defendant argues, though, that an arrestee retains an expectation of privacy in places and goods even after they are exposed to the authorities, citing *Michigan v. Tyler* (1978), 436 U.S. 499, 56 L. Ed. 2d 486, 98 S. Ct. 1942, and *State v. Simpson* (1980), 95 Wash. 2d 170, 622 P.2d 1199.

In *Tyler,* firemen conducted a search to discover evidence of arson on the defendant's property several days after the fire was extinguished. Under these circumstances, the court said, a warrant was required even though the

firemen had been at the site during the fire. (See also *People v. Holloway* (1981), 86 Ill. 2d 78.) *Tyler,* like *Brett,* involved a search to discover new evidence not previously seen, which makes it factually inapposite to the instant case.

In *Simpson,* the defendant was arrested on a warrant for forgery. At the jail, the defendant's personal possessions, including keys to his truck, were inventoried and placed in a property box. Later that day, the police, suspecting the truck had been stolen, removed the truck keys from the property box, returned to the truck, and opened its door to find the vehicle identification number. A check of that number revealed the truck was stolen. The court ruled that this was an unlawful search since the defendant retained a legitimate expectation of privacy in the locked truck and the vehicle identification number concealed within it.

Both *Tyler* and *Simpson* involved searches for evidence not previously seen by the police. Other cases relied on by defendant similarly involved searches for evidence not in the plain view of the police during the inventory. *United States v. Chadwick* (1977), 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476 (search of foot locker); *United States v. Simmons* (7th Cir. 1977), 567 F.2d 314 (search of purse); *People v. Helm* (1981), 89 Ill. 2d 34 (search of purse); *People v. Bayles* (1980), 82 Ill. 2d 128, *cert. denied* (1981), 453 U.S. 923, 69 L. Ed. 2d 1005, 101 S. Ct. 3160 (search of suitcase at scene of auto accident); *People v. Hamilton* (1979), 74 Ill. 2d 457 (search of locked briefcase at hospital); *People v. Smith* (1980), 103 Cal. App. 3d 840, 163 Cal. Rptr. 322, *cert. denied* (1981), 451 U.S. 993, 68 L. Ed. 2d 854, 101 S. Ct. 2336 (search of purse).

In the instant case, defendant had not sought to preserve his expectation of privacy in the necklace by concealing it in a container. Rather, he carried it on his person. At the time of his arrest, he was searched and the necklace

was found and inventoried as part of a lawful inventory search. At this time, the necklace legitimately came into the plain view of the jail officer and thereafter remained in the possession, custody and control of the police.

The second look was not conducted to search for and discover evidence previously concealed in some way from the inventory officer. For this reason, the cases involving such searches are not applicable here. Rather, the instant case, like *Edwards, Jenkins,* and their progeny, involved a second look at personal effects previously exposed to police view under unobjectionable circumstances. Under the circumstances in this case the defendant did not have a reasonable and justifiable expectation of privacy in the necklace. We agree with the statement made in *Jenkins* that no reasonable expectations of privacy are invaded and no search occurs when police officers simply look again at what they had already lawfully seen. Here, as in *Jenkins,* there was no search. For these reasons, the order suppressing the evidence gathered pursuant to the second examination of the necklace was improper.

The judgments of the appellate and circuit courts are reversed and the cause is remanded to the circuit court of Peoria County for further proceedings.

*Reversed and remanded.*